IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| AIJALON RANGE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | No. 3:25-cv-3324-G-BN |
| | § | |
| AT&T SERVICES, INC., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Aijalon Range filed a *pro se* complaint against her former employer, Defendant AT&T Services, Inc. ("AT&T"), asserting violations of the Americans with Disabilities Act ("ADA"), the Family Medical Leave Act ("FMLA") and equivalent provisions of Texas law. *See* Dkt. No. 3 (alleging for example that she "faced ongoing discriminatory treatment from AT&T for her disabilities and was retaliated against for taking protected leave to treat said disabilities"; that, "[d]espite her proactive efforts to ensure her success in her role, her supervisor imposed unreasonable demands, provided conflicting instructions, and was unreasonably hostile towards Range – actions that not only exacerbated Range's medical conditions but also clearly singled her out compared to her colleagues"; that, "[w]hen Range attempted to address these issues and requested support, Range was met with retaliation, including an unwarranted Performance Improvement Plan and negative performance reviews that lacked basis and fairness").

Senior United States District Judge A. Joe Fish referred this case the undersigned United States magistrate judge for pretrial management under 28

U.S.C. § 636(b) and a standing order of reference.

AT&T moved to compel arbitration and stay proceedings. *See* Dkt. Nos. 11 & 12. Range responded, and AT&T replied. *See* Dkt. Nos. 16-18. And, for the reasons and to the extent set out below, the motion is granted.

**Discussion**

The motion to compel arbitration and stay proceedings pending arbitration is not dispositive of either this case or any claim or defense within it, such that a ruling on the motion would count as a final exercise of Article III power, and, so, the undersigned is authorized to enter an order, as opposed to a recommendation to Judge Fish. *See, e.g.*, *Horton v. LeafFilter N. LLC*, No. 3:25-cv-2138-X-BN, 2026 WL 1142385, at *1 (N.D. Tex. Apr. 27, 2026) (collecting cases).

"[A]rbitration is a matter of contract," so "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960).

And the Federal Arbitration Act ("FAA") provides that a written agreement to arbitrate in a contract involving interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

And, so, a party may bring a motion to compel arbitration under the FAA, and a court must direct parties to arbitration if it is "satisfied that the making of the agreement for arbitration ... is not in issue." *Id.* § 4.

To compel arbitration, the courts generally consider three questions. That is,

"[w]hether a party may be compelled to arbitrate is a two-step inquiry: did 'the parties agree to arbitrate'; and does 'any federal statute or policy render the claims nonarbitrable'" – and step one of this inquiry is itself "a two-step inquiry: 'is there a valid agreement to arbitrate'; and 'does the dispute in question fall within its scope.'" *Soni v. Solera Holdings, L.L.C.*, No. 21-10428, 2022 WL 1402046, at *3 (5th Cir. May 4, 2022) (per curiam) (cleaned up; quoting *Sherer v. Green Tree Servicing LLC*, 548 F.3d 379, 381 (5th Cir. 2008)).

"When deciding whether the parties agreed to arbitrate the dispute in question, courts generally ... should apply ordinary state-law principles that govern the formation of contracts." *Polyflow, L.L.C. v. Specialty RTP, L.L.C.*, 993 F.3d 295, 302-03 (5th Cir. 2021).

First, as to an agreement to arbitrate applicable to Range's claims, AT&T provides a declaration from a manager responsible for overseeing "the process by which candidates for employment with AT&T review, submit, and acknowledge documents in connection with their applications," which AT&T refers "to as 'pre-onboarding.'" Dkt. No. 12, ¶ 5. He explains in part:

> The pre-onboarding process occurs after a candidate has been offered a job but before he or she begins working for AT&T. Offers of employment with AT&T are contingent on a candidate's successful completion of the pre-onboarding process and background check.
>
> Beginning no later than June 2012 and continuing through December 2023, AT&T used an electronic system, known internally as "CareerPath," to manage its application and pre-onboarding processes. My job responsibilities require me to be, and I am familiar with, the use and contents of CareerPath.
>
> When a candidate begins the process of applying for employment with AT&T, he or she is required to use CareerPath to complete application documents electronically. Candidates may access

CareerPath through any computer with a connection to the internet. To apply for a position through CareerPath, a candidate first must create an account by entering his or her personal e-mail address and creating a confidential password. The candidate then uses his or her CareerPath account to access and complete the application documents. No one can access an individual's CareerPath account without using the individual's self-created confidential password. The candidate's self-created confidential password is not known or potentially accessible by AT&T personnel.

After a candidate submits his or her application, AT&T may extend an offer of employment and require candidates to review and complete mandatory documents. Since at least June 2012, all candidates selected for management positions at AT&T have received a document entitled "Management Arbitration Agreement" (MAA) as part of the pre-onboarding process. CareerPath is programmed to require review and acknowledgment of the MAA as a mandatory part of the pre-onboarding process.

To complete the MAA, the candidate (after entering CareerPath using his or her self-created confidential password) must review the document's terms and electronically sign his or her name on the form by entering the e-mail address he or she used to create the CareerPath account.

Career Path creates records of a candidate's application and pre-onboarding activities, including preserving the data entered by the candidate at the time the candidate completes his or her application and, if they receive and accept an offer, each of his or her pre-onboarding activities. AT&T maintains this information in the CareerPath systems in the ordinary course of business. In the course of my job duties, I have access to and control of this information.

On April 11, 2025, I accessed the Candidate Profile for Aijalon Range ("Range") in the CareerPath system. I can see that Range applied to a Sourcing Manager position on September 25, 2023.

I accessed the pre-onboarding records in connection with Range's application referenced in the preceding paragraph. According to these records, AT&T extended Range an offer of employment on October 6, 2023. A true and correct screenshot of the CareerPath screen displaying this information is attached to my declaration as Exhibit 1.

CareerPath archived a replica of the MAA electronically signed by Range. According to CareerPath, Range electronically signed and submitted the MAA on October 7, 2023. A true and correct copy of this document is attached to my declaration as Exhibit 2.

According to CareerPath, Range electronically signed and submitted the MAA on October 7, 2023. A true and correct copy of the CareerPath screen displaying this information is attached to my

declaration as Exhibit 3.

*Id.*, ¶¶ 6-15.

Range responds to this evidence by explaining in part:

> I do not dispute that I completed AT&T's electronic onboarding documents. I also cannot honestly say that I definitely did not electronically submit the arbitration agreement because I do not remember that specific document.
>
> What I do know is that I do not remember seeing, separately reviewing, or knowingly signing an arbitration agreement. At that time, I did not know what arbitration was or understand that it could mean giving up the ability to have employment claims heard in court.
>
> AT&T's records may show that something was electronically submitted through my CareerPath account, but I do not believe that automatically answers every question about whether I knowingly understood and agreed to arbitration.
>
> I am therefore asking the Court to independently review AT&T's evidence and determine whether AT&T has met its burden of showing that a valid arbitration agreement was formed.

Dkt. No. 17, ¶¶ 2-5.

Federal courts in Texas commonly find an agreement to arbitrate under similar circumstances, and nothing in Range's response causes the Court to find that these cases do not apply equally here. *See, e.g.*, *Norred v. Cotton Patch Café, LLC*, No. 3:19-cv-1010-G, 2019 WL 5425479, at *4-*5 (N.D. Tex. Oct. 22, 2019); *Carroll v. Vivid Seats, LLC*, No. 3:25-cv-127-X-BN, 2025 WL 1071880, at *3-*4 (N.D. Tex. Mar. 24, 2025), *rec. accepted*, 2025 WL 1071336 (N.D. Tex. Apr. 9, 2025).

Next, scope. "Because there is a valid agreement to arbitrate," the Court "considers whether the agreement includes a valid delegation clause. While that does not appear to be the case here, the evidence … reflects the broad scope of the agreement to arbitrate, a scope that easily includes [Range's] claims in this case." *Carroll*, 2025 WL 1071880, at *4; *see* Dkt. No. 12 at 11 ("You and the AT&T company

that employs you ('the Company') mutually agree to final and binding arbitration (except as provided below)[ – none of which are applicable here – ]of all claims (common law or statutory) that the Company might have against you, or that you might have against (1) the Company, (2) the Company's parent, subsidiary and affiliated entities, (3) the directors, employees, or agents of any of those companies (in their official capacity or otherwise), and (4) the successors and assigns of any of them."); *cf. Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016) ("Ordinarily both [inquires at step one – (1) whether there is a valid agreement to arbitrate and (2) whether the dispute fall within its scope] are questions for the court. But where the arbitration agreement contains a delegation clause giving the arbitrator the primary power to rule on the arbitrability of a specific claim, the analysis changes." (citations omitted)).

Last up, whether the claims are nonarbitrable. And it has not been shown that a "federal statute or policy renders the claims nonarbitrable," *Polyflow*, 993 F.3d at 302, considering that "[c]ourts in this Circuit have routinely held that plaintiffs' claims for violations of the ADA and FMLA are 'subject to mandatory arbitration,'" *Avalos v. Freemyer Indus. Pressure, LP*, No. 4:23-cv-583-P, 2023 WL 6883658, at *2 (N.D. Tex. Oct. 18, 2023) (collecting cases); *accord Santarino v. A.G. Edwards & Sons, Inc.*, 941 F. Supp. 609, 611-13 (N.D. Tex. 1996) (contracts to arbitrate ADA and FMLA claims enforceable); *see also Rojas v. TK Commc'ns, Inc.*, 87 F.3d 745, 748 (5th Cir. 1996) (same as Title VII claims).

The Court will therefore compel arbitration and stay and retain this case

pending the outcome of arbitration. *See, e.g.*, *Psara Energy, Ltd. v. Advantage Arrow Shipping, L.L.C.*, 946 F.3d 803, 807-08 (5th Cir. 2020).

**Conclusion**

The Court GRANTS Defendant AT&T Services, Inc.'s motion to compel arbitration and stay proceedings [Dkt. No. 11]. And, so, the Court STAYS this case, RETAINS it while the parties proceed to arbitrate, and ORDERS AT&T's counsel to file on behalf of the parties a joint status report by **February 12, 2027.**

SO ORDERED.

DATED: November 13, 2026

DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE